UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROBERT H. GROMAN and HELGA HENSING, as
Co-Executors of the Last Will and Testament of
CHRISTO BYRON PAPPAS,

                              Plaintiffs/Petitioners,

                                             07 CV. 2635 (RPP)

        - against -

                                             **OPINION AND ORDER**

NICHOLAS COLA,

                              Defendant/Respondent.
------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       Plaintiffs Robert H. Groman and Helga Hensing, Co-Executors of the Last Will and Testament of Christo Byron Pappas, commenced this action on behalf of the Estate of Christo Byron Pappas on December 22, 2006, in the Surrogate's Court of the State of New York, New York County. On March 30, 2007, Defendant Nicholas Cola filed a notice of removal to the United States District Court for the Southern District of New York based on diversity of citizenship, pursuant to 28 U.S.C. § 1332 and § 1441(a). After removing this action to federal court, Defendant filed an answer, affirmative defenses, and counterclaims. On August 24, 2007, Plaintiffs filed this motion to remand to New York County Surrogate's Court on the ground that the probate exception bars this Court's exercise of subject matter jurisdiction. For the following reasons, Plaintiffs' motion to remand is granted but without an award of costs and attorneys' fees.

**BACKGROUND**

The underlying action in this case stems from a dispute over the purchase price of shares of Byron Chemical Company, Inc. ("Byron") that were sold by the Estate of Christo Byron Pappas (the "Estate") to Defendant Nicholas Cola on December 22, 2003. In September 1993, Christo Byron Pappas ("Pappas"), formerly the sole shareholder of Byron, transferred 9% of his Byron shares each to Defendant, Vice President of Sales of Byron, and to Laura Candela ("Candela"), Vice President of New Product Development. (Def.'s Mem. Law Opp'n to Pls.' Mot. to Remand at 2.) The three individuals entered into a Shareholder Agreement which provided that, upon the death of a shareholder, the other shareholders will purchase the decedent shareholder's shares. (Pls.' Notice Mot. to Remand, Ex. A at 10-14.) The Shareholder Agreement, as amended on December 23, 2002, set the purchase price of the decedent shareholder's shares at one hundred fifty percent of the book value of such shares, as set forth on Byron's balance sheet attached to the most recent U.S. Corporate Income Tax Return filed prior to the date of death.[1] (Pls.' Notice Mot. to Remand, Ex. A, First Amendment at 2.)

Pappas died on June 6, 2003, at which time he was a resident and domiciliary of the City and State of New York. (Groman Aff. ¶ 2.) On October 23, 2003, the New York County Surrogate's Court admitted his Last Will and Testament to probate and issued Letters Testamentary to Plaintiffs Groman and Hensing.[2] (Id. ¶¶ 2-5.) Upon the death of Pappas, the Estate became the majority owner of 82% of Byron shares.

---

[1] The amended Shareholder Agreement provided that, in the event that the most recent tax return did not contain a balance sheet from which the book value could be determined, then the book value shall be determined from Byron's books and records as determined by Byron's accountant. (Pls.' Mot. to Remand, Ex. A, First Amendment at 2.)

[2] Letters Testamentary were also issued to Laura Candela, whom the Will named as a third co-executor. But in or about November 2004, Candela resigned as co-executor, and the resignation was approved by order of the New York County Surrogate's Court. (Groman Aff. ¶¶ 5, 7-8.)

Pursuant to the Shareholder Agreement, Defendant purchased 41% (or 82 shares) of Byron from the Estate at the stock sale closing on December 22, 2003. (Id. ¶ 16.) The purchase price was based upon the book value of the shares of Byron purchased, as reflected on the balance sheet as of December 31, 2002, attached to Byron's 2002 United States Income Tax Return. (Pls.' Notice Mot. to Remand, Ex. C at ¶ 19.) As consideration for the shares, Defendant tendered to the Estate a total price of $1,721,081.80: a check in the sum of $172,108.18 (10% of the purchase price) and the balance by a non-negotiable promissory note in the amount of $1,548,973.00 payable to the Estate. (Groman Aff. ¶ 18.) Defendant has made timely payments due on the note, and the Estate has accepted these payments through 2006. (Def.'s Mem. Law Opp'n to Pls.'s Mot. to Remand at 3.)

At the time of the stock sale closing on December 22, 2003, however, there was an issue as to the accuracy of the balance sheet attached to Byron's 2002 tax returns. (Groman Aff. ¶ 19; see also Pls.' Notice Mot. to Remand, Ex. B at 1.) Therefore, at the closing, the parties entered into a Price Adjustment Agreement, by which both Plaintiffs and Defendant reserved the right to claim whether or not a purchase price adjustment should be made. (Groman Aff. ¶ 20.) The agreement provided that the price shall be adjusted "[i]f a Purchase Price adjustment is agreed to between the parties or required by Court Order." (Pls.' Notice Mot. to Remand, Ex. B at 1.) In the event the purchase price were increased, Defendant would be obligated to tender to the Estate a supplemental note for the difference; if the purchase price were decreased, the note that Defendant tendered at the closing would be recast to reflect the lower amount. (Groman Aff. ¶ 21.)

In early 2004, Candela, who had declined to purchase the other 41% of Byron shares pursuant to the Shareholder Agreement, brought an action against Byron, the Estate of Pappas, and George Liss, the former accountant for Byron, in the Supreme Court, State of New York, County of Nassau.[3] (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶ 93.) Based on information she discovered following the death of Pappas, Candela alleged that Pappas had caused Byron's inventory to be underreported on the tax returns filed by Byron and that Pappas had improperly and fraudulently underpaid her mandatory bonus over the ten years of her employment. (Id. ¶¶ 95-96.) In a decision dated July 24, 2006, the Supreme Court Justice made a number of findings, including that for more than ten years Pappas had caused the inventory of Byron to be underreported on Byron's corporate income tax returns and had caused Byron to underpay Candela's mandatory bonus of 10% of Byron's gross profits.[4] (Id. ¶ 101 (citing Candela v. Byron Chemical Co., No. 328/04 (N.Y. Sup. Ct., Nassau County, July 24, 2006)); id., Ex. A at 25.) That decision is currently on appeal. (Id. ¶ 102.)

In early 2004, around the same time Candela brought her action, an independent accounting firm prepared, at Candela's request, a Draft Financial Statement, which proposed adjustments on Byron's balance sheet for the year ending December 31, 2002, including an adjustment upward for inventory in the amount of $2,270,534. (Def.'s

---

[3] Initially, Defendant Cola was also named as a defendant in Candela's action, but the Nassau County Supreme Court dismissed the case as against Cola as a result of his motion to dismiss. (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶ 94.)

[4] Defendant Cola's employment agreement contained an identical provision to the one in Candela's agreement, which entitled him, as an executive employee, to a mandatory bonus of 10% of Byron's gross profits. (Def.'s Answer, Affirmative Defenses, and Counterclaims, Ex. A at 20.) At the time of Candela's action, Defendant did not make a claim that his employment agreement required payment to him of 10% of Byron's gross profits as reported in the corporate income tax returns. (Id.) Defendant now asserts, in his counterclaim, that because he had an identical provision in his employment agreement, he is entitled to the same amount as the Nassau County Supreme Court determined Candela was entitled, if that decision is upheld. (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶ 112.)

Notice of Removal ¶¶ 43-46.)  At a special joint meeting on March 24, 2004, the Board of Directors of Byron, including Defendant Cola, unanimously resolved to adopt the inventory reflected on the Draft Financial Statement for Byron's 2002 balance sheet prepared by the independent accounting firm.  (Id. ¶ 47.)

On December 22, 2006, subsequent to the Nassau County Supreme Court's decision in Candela's action, Plaintiffs commenced this proceeding on behalf of the Estate in the New York County Surrogate's Court.  Plaintiffs' petition sought a declaration that the purchase price must be adjusted upward to reflect upward inventory adjustments and a determination of the amount of such upward adjustment to be $1,396,378.41, plus accrued interest.  (Pls.' Notice of Mot. to Remand, Ex. C at 1.)  Defendant, a New Jersey citizen, removed this proceeding to this Court based upon diversity of citizenship.  Defendant subsequently filed counterclaims in this Court seeking a declaration that, at the time of the stock sale closing, Byron had a negative book value due to a number of liabilities, including Candela's claims; a declaration that the promissory note he tendered at the closing is null and void; and a determination that the Estate must reimburse Defendant in the amount of $1,215,937.17, which includes all sums tendered at the closing and paid thus far on his promissory note.  (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶¶ 121-22.)  Plaintiffs then moved to remand this proceeding to New York County Surrogate's Court.  Plaintiffs do not contest that the requirements of diversity jurisdiction under 28 U.S.C. § 1332 are met; they argue instead that this Court lacks subject matter jurisdiction under the probate exception to federal diversity jurisdiction.

## DISCUSSION

### I. Removal Jurisdiction

Under 28 U.S.C. § 1441, a defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a) (2000). A district court is required to remand the action to state court, however, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." Id. § 1447(c). As removal is a statutory and not constitutional prerogative, federal courts must narrowly construe removal jurisdiction in favor of the non-removing party to prevent intrusion on the sovereignty of state courts to decide cases properly before them. Shamrock Oil Corp. v. Sheets, 313 U.S. 100, 107-09, (1941). Such narrow construction is also warranted because removal "abridges the deference courts generally give to a plaintiff's choice of forum." Frontier Ins. Co. v. MTN Owner Trust, 111 F. Supp. 2d 376, 378 (S.D.N.Y. 2000).

Acknowledging that this case requires fine line drawing, the Court is further guided by the principle that where removal jurisdiction is doubtful, remand is appropriate. Somlyo v. J. Lu-Rob Enterprises, Inc., 932 F.2d 1043, 1045-46 (2d Cir. 1991) (stating that "federal courts construe the removal statute narrowly, resolving any doubts against removability"); Lowe v. Trans World Airlines, Inc., 396 F. Supp. 9, 12 (S.D.N.Y.1975) (noting "the basic principle that if the right to remove is doubtful, the case should be remanded"). Remand is warranted in close cases because it spares the litigants the possibility of relitigation, Video Connection of Am. Inc. v. Priority Concepts, 625 F. Supp. 1549, 1551 (S.D.N.Y 1986), and avoids the unnecessary extension of federal jurisdiction at the expense of state sovereignty, Shamrock Oil & Gas

6

Corp., 313 U.S. at 108-09. Mindful of these cautions, the Court turns to the question raised by Plaintiffs' motion to remand—i.e., whether the probate exception bars the Court's exercise of otherwise valid subject matter jurisdiction based on diversity of citizenship over this case.

**II. The Probate Exception**

The probate exception excludes "probate matters" from otherwise proper federal diversity jurisdiction. Marshall v. Marshall, 547 U.S. 293, 308 (2006) (internal quotation marks omitted). It is a "judicially created doctrine[]" of uncertain origin, "stemming in large measure from misty understandings of English legal history." Id. at 299. Although the probate exception has been described as "'one of the most mysterious and esoteric branches of the law of federal jurisdiction,'" Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc., 918 F.2d 1065, 1071 (2d Cir. 1990) (quoting Dragan v. Miller, 679 F.2d 712, 713 (7th Cir. 1982)), it is nonetheless "too well established a feature of our federal system to be lightly discarded," id. at 1071.

Ascertaining the parameters of the probate exception presents a close question, as the scope of the exception has been nearly as uncertain as its origins. For years, lower courts have broadly interpreted the Supreme Court's definition of the exception in Markham v. Allen, 326 U.S. 490 (1946), which elaborated on the principle that "a federal court has no jurisdiction to probate a will or administer an estate." Id. at 494. In Markham, the Court defined the scope of the exception as follows:

> [F]ederal courts of equity have jurisdiction to entertain suits in favor of creditors, legatees and heirs and other claimants against a decedent's estate to establish their claims so long as the federal court does not

7

> interfere with the probate proceedings or assume general jurisdiction of
> the probate or control of the property in the custody of the state court.

Id. at 494 (internal quotation marks omitted). In line with other federal circuits, the Second Circuit read this definition of the exception broadly. For example, in Moser v. Pollin, 294 F.3d 335 (2d Cir. 2002), the court held that the probate exception barred the district court's exercise of diversity jurisdiction over a plaintiff's complaint that sought punitive damages and a constructive trust to be imposed on all of the decedent's assets held by the executrix and sole beneficiary of the decedent's estate, whom the plaintiff alleged committed fraudulent concealment and constructive fraud in connection with the probate of the decedent's will. Id. at 339.

In response to then expansive interpretations of the probate exception, the Supreme Court, in Marshall v. Marshall, 547 U.S. 293 (2006), clarified that the scope of the exception was narrow. Acknowledging that the language in Markham prohibiting federal courts from interfering with probate proceedings is "not a model of clear statement," the Court "read Markham's enigmatic words" as limited "to proscribe 'disturb[ing] or affect[ing] the possession of property in the custody of a state court.'" Id. at 310-11 (alterations in original) (quoting Markham, 326 U.S. at 494). The Court then defined the parameters of the probate exception as follows:

> [T]he probate exception reserves to state probate courts the probate or
> annulment of a will and the administration of a decedent's estate; it also
> precludes federal courts from endeavoring to dispose of property that is in
> the custody of a state probate court. But it does not bar federal courts
> from adjudicating matters outside those confines and otherwise within
> federal jurisdiction.

Id. at 311-12. Based on this definition, the Marshall Court held that the bankruptcy and district courts below properly exercised jurisdiction over the plaintiff's claim against the

8

beneficiary of her decedent husband's estate plan for tortious interference with the plaintiff's expected inheritance prior to the probate of the will. Id. at 314.

The Second Circuit applied Marshall's definition of the probate exception in Lefkowitz v. Bank of New York, No. 04-0435-cv, 2007 WL 1839756 (2d Cir. June 28, 2007). There, the Second Circuit affirmed in part and reversed in part the district court's dismissal of the plaintiff's claims against the executors of her parents' estates based on lack of subject matter jurisdiction under the probate exception. In splitting its decision, the court sorted out the claims that fell outside the probate exception because, although they were "intertwined" with estate administration, they did not require the federal court to assert control of any property in the custody of state court. Id. at *5. This category of claims included the plaintiff's *in personam* claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent misrepresentation, and fraudulent concealment. Id. The court observed that "[w]ith these claims, Plaintiff seeks damages from Defendants personally rather than assets or distributions from either estate." Id.

On the other hand, the Second Circuit affirmed the dismissal of a number of claims in Lefkowitz because, to provide relief, the federal court would have to assert control over property that remains under the control of the state courts. Id. at *4. These claims included a conversion claim alleging that the executors wrongfully withheld estate funds from the plaintiff, an unjust enrichment claim alleging that the executors failed to distribute income belonging to the plaintiff, unpaid claims for moneys owed with respect to the plaintiff's legal fees, a claim for specific performance of a consent order issued by another court that required specific sums to be distributed from plaintiff's shares in her parents' estates to her creditors, and a claim for declaratory judgment as to certain assets

of the estates. Id. The Lefkowitz court concluded that these claims were subject to the probate exception because "to provide the relief Plaintiff [sought on these counts,] the federal court would have to assert control over property that remains under the control of the state courts." Id.

### A. Plaintiffs' Claims

Plaintiffs' motion to remand calls upon this Court to determine, based on Marshall and Lefkowitz, on which side of the line Plaintiffs' claims fall with respect to the probate exception.[5] Determining whether this case falls within the probate exception involves a two-part inquiry: first, whether the action requires "the probate or annulment of a will [or] the administration of a decedent's estate"; and second, whether the action requires the court "to dispose of property that is in the custody of a state probate court." Marshall, 547 U.S. at 311-12. If this proceeding requires the Court to take either of these actions, federal court jurisdiction is barred under the probate exception. The main contention between the parties addresses the second inquiry of whether this proceeding concerns the disposal of property in the custody of a state probate court.

Defendant argues that the probate exception does not apply because "nothing in this action applies to a *res* in the *custody* of the state court, and a declaration as to either party's rights under the Shareholder's Agreement or Price Adjustment Agreement would

---

[5] The present action came before the Court by way of removal, unlike in Marshall v. Marshall and Lefkowitz v. Bank of New York, where the claims originated in federal court. In Lefkowitz, the plaintiff filed a diversity action in the Southern District of New York. No. 04-0435-cv, 2007 WL 1839756, at *1 (2d Cir. Jun 28, 2007). In Marshall, the plaintiff's tortious interference claim was brought as a counterclaim in an adversary proceeding in the U.S. Bankruptcy Court for the Central District of California. After the plaintiff had filed bankruptcy in that court, the defendant filed a proof of claim in that same proceeding. The plaintiff brought a counterclaim of tortious interference, which turned the matter into an adversary proceeding. The Bankruptcy Court granted summary judgment in favor of the plaintiff. The defendant then sought district court review of the Bankruptcy Court's judgment with federal jurisdiction premised on 28 U.S.C. § 1334, which vests in district courts jurisdiction in bankruptcy cases and related proceedings. Marshall, 547 U.S. 293, 300-02 (2006).

10

not interfere with the probate proceedings." (Def.'s Mem. Law Opp'n to Pls.' Mot. to Remand at 6.) According to Defendant, Plaintiffs are seeking an *in personam* judgment for the payment of Byron shares that have not been in the custody of the Surrogate's Court since December 22, 2003, when Defendant purchased them. (Id. at 6-7; see also Def.'s Letter Br. on Countercl. Issue Raised at 10/1/07 Oral Argument at 7.) Defendant also emphasizes that, in this case, Plaintiffs seek "new money" to be paid into the Estate rather than existing money to be distributed out of the Estate. (Def.'s Letter Br. on Countercl. Issue Raised at 10/1/07 Oral Argument at 6.)

Defendant, however, mischaracterizes the nature of Plaintiffs' claims. Although Plaintiffs do seek a specific determination of the amount of money Defendant owes the Estate, this action is, at heart, a dispute about the proper valuation of an estate asset in a sale by the Estate's executors. Because the Byron shares were held by Pappas at the time of his death, they automatically became an asset of the Estate. See Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 254 (S.D.N.Y 2006) (distinguishing a case where the property at issue "remained in the decedent's full possession until her death, and was thus considered an asset of the estate" from a situation where the probate exception was inapplicable because the decedent had made an inter vivos transfer of the property at issue, and the plaintiff-executor was challenging the validity of the inter vivos deed). It is uncontested that both parties agreed at the time of the stock sale closing that the purchase price of the Byron shares purchased by Defendant from the Estate could be adjusted by a court determination. Plaintiffs now seek such a determination. They do not seek "new money" (in Defendant's characterization) or new assets, as would an action for damages or an action to declare invalid a decedent's inter vivos deed. Instead, Plaintiffs are

seeking an adjustment in the purchase price of an asset held by the decedent at the time of probate.

More importantly, Defendant is incorrect when he claims that "nothing in this action applies to a *res* in the *custody* of the state court." (Def.'s Mem. Law Opp'n to Pls.' Mot. to Remand at 6.) Even if the Byron shares that Defendant purchased were no longer considered property in the Surrogate Court's custody after being sold, this case still concerns a *res* in the custody of the Surrogate's Court. The non-negotiable promissory note in the amount of $1,548,973.00 that Defendant tendered to the Estate on December 22, 2003, is an asset, or *res*, of the Estate. So too is Plaintiffs' interest in the Price Adjustment Agreement. The note and Plaintiffs' inchoate rights under the Price Adjustment Agreement remain in the possession of the Estate and its executors, who are officers appointed by the Surrogate's Court; as such, the note and contractual rights of the Estate are in the possession and control of the Surrogate's Court. See Byers v. McAuley, 149 U.S. 608, 615 (1893) ("An administrator appointed by a state court is an officer of that court; his possession of the decedent's property is a possession taken in obedience to the orders of that court; it is the possession of the court, and it is a possession which cannot be disturbed by any other court.").

Plaintiffs' claims under the Price Adjustment Agreement require the Court to determine and possibly adjust the value of the note and to direct the proceeds of the note. Such a determination by the Court would "disturb[] or affect[] the possession of property in the custody of a state court," which is an exercise of jurisdiction proscribed by the probate exception. Marshall, 547 U.S. at 311 (internal quotation marks omitted).

Because the probate exception bars this Court from exercising subject matter jurisdiction over Plaintiffs' complaint, this case must be remanded to the Surrogate's Court.

### B. Defendant's Counterclaims

Plaintiffs argue that, in addition to the affirmative claims in their complaint, Defendant's counterclaims bring this case within the probate exception. (Pls.' Reply Mem. Law Supp. Mot. to Remand at 3.) Defendant's counterclaims seek a declaration that a downward price adjustment is required, a determination that Plaintiffs must reimburse Defendant for all sums paid to the Estate for the shares he purchased, totaling more than $1.2 million, and a declaration that the Estate's note is null and void. (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶ 122.) As Plaintiffs point out, these counterclaims, like the claims that were properly dismissed in Lefkowitz, seek "'specific distributions'" from estate funds. (Pls.' Supplemental Letter Br. at 3 (quoting Lefkowitz, 2007 WL 1839756, at *4).)

Defendant's counterclaims fall within the probate exception. By seeking the distribution of sums in the possession of the Estate and the nullification of the promissory note, which is an asset of the Estate, the counterclaims require this Court to "assert control over property that remains under the control of the state court." Lefkowitz, 2007 WL 1839756, at *4. Although remand in this case could be based solely on the ground that Plaintiffs' complaint is subject to the probate exception, the nature of Defendant's counterclaims adds further support to the Court's conclusion that exercising jurisdiction would cause the Court to disturb property in the custody of the Surrogate's Court.

Defendant argues that his counterclaims cannot serve as a basis for remand to any extent under the well-pleaded complaint rule. The well-pleaded complaint rule states that

a plaintiff cannot base federal jurisdiction on the defendant's defenses and must instead establish jurisdictional grounds in the complaint. Louisville and Nashville Railroad v. Mottley, 211 U.S. 149 (1908). As the Supreme Court has noted, "[t]he well-pleaded complaint rule applies to the original jurisdiction of the district courts as well as to their removal jurisdiction." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 10 n.9 (1983) (holding that the district court did not have removal jurisdiction over a suit by a state against a welfare benefit trust seeking to collect taxes on the basis of the question of whether the Employee Retirement Income Security Act preempted the state's power to levy on funds held in trust); see also 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3721 (3d ed. 1998) (noting "the principle that the grounds for removal must inhere in the plaintiff's claim, rather than be based on a defense or counterclaim").

With respect to federal jurisdiction based on diversity rather than federal question, it is true that courts in this district are among the majority in observing strict adherence to the well-pleaded complaint rule when determining whether the amount-in-controversy requirement is met. See Video Connection of Am. Inc., 625 F. Supp. at 1551 n.4; Wright, Miller & Cooper, supra, § 3706 n.43. This majority position "is consistent with the governing proposition adopted by the Supreme Court in Shamrock Oil Corp. v. Sheets, 313 U.S. 100, 107-09, (1941), when it noted that . . . removal jurisdiction must be narrowly construed in favor of the non-removing party to prevent encroachment on the right of state courts to decide cases properly before them." Wright, Miller & Cooper, supra, § 3721. Defendant's reliance on the well-pleaded complaint rule in this case is

misplaced because, here, the governing proposition established in Shamrock weighs in favor of Plaintiffs and remanding to the Surrogate's Court.

Maintaining removal jurisdiction over the complaint in this case would present significant administrative challenges. Defendant's counterclaims are compulsory, as they arise out of the same transaction or occurrence from which Plaintiffs' claims arise. See Fed. R. Civ. P. 13(a). Indeed, this case involves claims and compulsory counterclaims that are, as Plaintiffs describe, "mirror images of each other." (Pls.' Supplemental Letter Br. at 4.) Plaintiffs seek a declaration that an upward adjustment in price is required and the payment of a supplemental note; Defendants seek a declaration that a downward adjustment is required, the reimbursement of more than $1.2 million, and the nullification of the note tendered at the closing. The claims are the inverse of one another.

To exercise jurisdiction over Plaintiffs' claims while remanding the Defendant's counterclaims would create undue administrative complexity and possible preclusive effects within this litigation. See Note, Federal Jurisdictional Amount: Determination of the Amount in Controversy, 73 Harv. L. Rev. 1369, 1379 (1960) ("[I]f the claims of the plaintiff and defendant both arise out of the same transaction or occurrence, entertaining the defendant's independent action in a federal court would result in two simultaneous trials on the same facts, and a race to judgment if collateral estoppel is a significant factor."). This case already comes in the shadow of a proceeding in state supreme court, which is currently on appeal. (Def.'s Answer, Affirmative Defenses, and Counterclaims ¶¶ 93-96.) The findings in that proceeding, if upheld, could be determinative with respect to whether an upward or downward adjustment of the purchase price is required in this case. It would not only encroach on the sovereignty of the Surrogate's Court to decide

15

this case, but it would also be an improvident exercise of court administration to send Plaintiffs' claims and Defendant's counterclaims down two different and simultaneous tracks. The interests of efficient, fair, and sensible court administration, therefore, weigh in favor of remand in this case, as does the law.

### III. Costs and Attorneys' Fees

Plaintiffs request the Court to award the Estate costs and attorneys' fees incurred as a result of Defendant's removal, pursuant to 28 U.S.C. § 1447(c), which provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, as a result of the removal." 28 U.S.C. § 1447(c). Considering the "overall fairness given the nature of the case, the circumstances of remand, and the effect on the parties," Morgan Guaranty Trust Co. of New York v. Republic of Palau, 971 F.2d 917, 924 (2d Cir. 1992), this request is denied. Under 28 U.S.C. § 1447(c), in the absence of unusual circumstances, "attorneys' fees should not be awarded when the removing party has an objectively reasonable basis for removal." Martin v. Franklin Capital Corp., 546 U.S. 132, 136 (2005). Given the recent holdings in Marshall and Lefkowitz, Defendant had an objectively reasonable basis for removal in this case. Particularly because the Price Adjustment Agreement failed to specify in which court the parties could assert their rights, Defendant should not be penalized for exercising what he reasonably believed to be his prerogative to adjudicate this case in a federal forum.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to remand is granted, and Plaintiffs' request for costs and attorneys' fees is denied.

IT IS SO ORDERED.

Dated: New York, New York
November 7, 2007

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order sent to:

*Counsel for Plaintiffs/Petitioners*
James M. Wicks, Esq.
Aaron E. Zerykier, Esq.
Frank T. Santoro, Esq.
FARRELL FRITZ, P.C.
1320 RexCorp Plaza
Uniondale, NY 11556-1320
Tel: (516) 227-0700
Fax: (516) 227-0777

*Counsel for Defendant/Respondent*
Michael A. Lampert, Esq.
Saul Ewing LLP
750 College Road East, Suite 100
Princeton, NJ 08540-6617
Tel: (609) 452-3123
Fax: (609) 452-3125